**UNITED STATES of America,**
**Plaintiff,**

v.

**CROWELL, COLLIER AND MACMILLAN, INC., Defendant.**

**No. 70 Civ. 460 HRT.**

United States District Court,
S. D. New York.

May 4, 1973.

Jerome A. Hochberg, John H. Clark, Ivor C. Armstead III, Jill Devitt, Attys., Department of Justice, Antitrust Division, for plaintiff.

Cadwalader, Wickersham & Taft, New York City, by George D. Reycraft, John Boyer, Wendell B. Alcorn, New York City, of counsel, for defendant.

## OPINION

TYLER, District Judge.

This suit, instituted by the United States on February 14, 1970, attacks the acquisitions of Uniforms by Ostwald, Inc. ("Ostwald") and C. G. Conn Ltd. ("Conn") by Crowell, Collier and Macmillan, Inc. (CCM) as violative of § 7 of the Clayton Act, 15 U.S.C. § 18. Divestiture of both acquired companies is the relief sought.

## CROWELL COLLIER and MACMILLAN

CCM, the acquiring company, is a conglomerate, ranked by Fortune Magazine as the nation's 286th largest industrial

concern, and 238th largest in terms of assets. It has been described by the chairman of its board as a cultural conglomerate, and, looking to its constituent companies, the description is apt. CCM is responsible for Colliers and Merit Students Encyclopaedias, and the entire line of Macmillan, the established and reputable publishing house. In the home study field, CCM owns the LaSalle Extension University which, through its various divisions, offers college and high school level programs, the Utilities Engineering Institute and the U. S. School of Music. Berlitz (languages) and Katherine Gibbs (secretarial training) are also CCM subsidiaries. School and institutional materials of all types are manufactured and distributed by CCM, and even a janitorial service is included in the array.

A good number of professional publications are put out by CCM, mostly designed for the educator and school administrator, and several sizeable book retailers, such as Brentanos, are owned. Audio visual aids are another CCM area of endeavor.

In the area of music manufacture and distribution, CCM owns Slingerland Drum Co. and G. Schirmer, Inc. C. E. Ward Company, presently a maker of choir robes and lodge regalia, and, up until at least 1969, a maker of band uniforms, is also a subsidiary.

In 1969, CCM's marketing activities were handled by 1,700 sales personnel, 375 of whom serviced educational institutions. As of 1970, six regional curriculum centers were maintained by CCM as distribution facilities for school directed products.

CCM has reached its present size primarily through a recent program of acquisitions. In 1961 it showed sales of $71,200,000. By 1970, 39 acquisitions later, its gross revenues had reached $400,300,000.[1]

I

## OSTWALD ACQUISITION

Ostwald was acquired by CCM on December 28, 1968. It is a manufacturer and distributor of band uniforms, with gross sales of $6,391,000 for 1968, of which 96.2% or $6,146,000 reflect purchases by education institutions or booster clubs for educational institutions.

These figures reflect all of Ostwald's sales of band uniforms, and subsumes what has been raised as an issue herein, that traditional military as well as blazer-type uniforms are part of the relevant market. Looking just to traditional uniforms, Ostwald's 1968 dollar volume drops a little over $200,000 to $6,178,000.

### A. THE BAND UNIFORM MARKET

#### 1. Shares

Ostwald's 1968 share of the general band uniform market was 41.9%. When the calculations are limited to traditional military type uniforms, Ostwald's share for that year rises to 44.5%. CCM–Ostwald did attempt at trial to expand the scope of the government's universe of band uniform manufacturers and distributors, but the proof on that point was weak, and, in any event, the actual difference of Ostwald's attributed percentages is relatively insignificant within the context of the issues.

#### 2. Market Structure

Accepting GX 128 and 131, based as they appear to be on defendant's answers to interrogatories and affidavits of band uniform makers, only 17 manufacturers figure in the general band uniform industry, and, of these, only 11 can lay claim to a one percent or greater share of the market. When only traditional uniforms are considered, the 7th ranked company, with 4.1% of the general market, drops out, leaving 16 concerns, 11 of which hold a one percent or greater share of overall sales. Using ei-

---

1. GX 1 (reference "GX" is that of plaintiff's exhibits).

ther ranking, Ostwald is the industry leader, commanding four times the sales of the number two concern.

Below Ostwald, however, there appears to be three plateaus, on either the traditional or general ranking. The top four firms control 69.6% (general) and 73.9% (traditional) of the market.

Testimony at trial established that the industry is made up of family-run concerns (Heldman TR. 61, DeMoulin TR. 128, Frank TR 175). Band uniforms are made to order and produced in small lots; business is highly seasonal (GX 22 at 11, Heldman TR. 105-6, Gibson TR. 548). It is a stable industry, as the major competitors and their respective market shares have remained essentially constant (Frank TR. 186, Heldman TR. 83, DeMoulin TR. 144). Profit margins are lower than in the uniform trade generally (DX–BG, Plaintiff's Answers to Interrogatories 6(p) and 45, Heldman TR. 105-6).[2]

*3. Sales*

Band uniforms are sold primarily, 80-95%, to schools, universities and booster clubs for universities and schools. (Heldman TR. 64-5, DeMoulin TR. 129-30, GX 20). The marketing process begins by a sales representative personally soliciting a school band director. The director will request sketches which are prepared by the salesman or a designer for the company he represents. These the director may subsequently alter, and will, in any event, circulate to the other uniform makers competing for the order. Specifications are then written up and bids taken. Samples are produced, sometimes before, but normally after an order is placed. The successful salesman takes the measurements of the prospective wearers, and production finally begins. Delivery is made, the salesman fits the uniforms and any necessary alterations are attended to (Portner TR. 743-44).

This process is repeated on a 3, 5 or 10 year cycle, depending on the useful life expectancy of a given uniform (DeMoulin TR. 162-63, Revelli TR. 242, Portner TR. 741, Ohainan TR. 894). In the interim, music educators' conventions and trade shows are attended, at which booths are set up and, hopefully, contacts made (Ohainan TR. 888, DeMoulin TR. 130, Heldman TR. 84, GX 1, para. 24).

Salesmen, for the most part, are independent, as the companies they represent do not generate enough sales to justify full association (Frank TR. 188, Heldman TR. 67, 88-89). Sol Frank Uniforms, Inc., for example, ranked number 3 (general) or 4 (traditional) in the industry (GX 128, 131), has one man working on a drawing account against commissions and 20 to 25 part-time representatives on a commission-only basis (Frank TR. 189-90). Non-employee salesmen carry other products of the companies such as choir robes, diplomas, class rings, year books, paper goods, and banners (Gibson TR. 577, Heldman TR. 66).

Ostwald, prior to its acquisition by CCM, and adding in the sales force of C. E. Ward, a band uniform maker commanding 0.6% of the general market before it joined CCM in 1968, had 24 independent sales representatives as well as representation in the southwest by about 20 agents of the wholly separate Star Engraving Co. (McIlhenny TR. 466, Gibson TR. 547). After CCM's acquisition of Ostwald, the combined sales force still numbered 24, but these were converted to full-time employees, receiving a draw against commissions (McIlhenny TR. 466). Star Engraving Co. still represents Ostwald in the southwestern United States on the same independent basis as before (Gibson TR. 546-47).

Ostwald prefers to hire new salesmen who have had at least some general sales experience (McCarthy TR. 584). New men are put through a training period, beginning with a road trip with a sales training manager. The first two days

---

**2.** Reference "TR" is to the transcript of the testimony given during the trial. Reference "DX" is to defendant's exhibits.

are spent learning fabrics and terminology, after which follows a demonstration week of customer calls. Then the trainee goes out on his own and is later rejoined by his teacher who observes what progress has been made. The training period lasts from 2 to 5 weeks. (McCarthy TR. 586–87, DeMoulin TR. 138).

*4. Promotion*

Compared to other industries, advertising is minimal, consisting primarily of spots in music educator journals and direct mailings to band directors. According to DX–N, Ostwald's direct advertising costs for the years 1965 to 1972 remained consistently between $30,000 and $36,000, save for 1969 and 1970, when Ostwald spent $67,421 and $56,738 respectively. All promotional expenses, including internal sales contests and the costs of attending conventions, never exceeded $93,307 in any one of these years, reaching a peak in relation to sales revenues of 1.69% in 1969 (DX–N). Discounts for volume in trade magazines at this level of expenditures are insignificant (See, e. g., testimony of John Majeski, Editor of Music Trades Magazine, Inc. in relation to instrument advertisements. TR. 874).

One promotional device attempted by Ostwald after its acquisition by CCM, however, has been the focus of concern herein, not so much for its magnitude but for its implications. CCM, in May, 1969, acquired C. G. Conn, Ltd., a prominent name in musical instrument manufacture. As will be discussed hereinafter, the government attacks the Conn acquisition as a violation of § 7 of the Clayton Act, see Part II *infra*. It is relevant to note here, however, that, once Conn joined the CCM "family", CCM–Ostwald briefly tried a promotional scheme of offering Conn instruments as bonuses for purchases of Ostwald band uniforms; as will be seen, the scheme "backfired".

As stated, the band uniform trade is a seasonal one, the peak selling period occurring between January and May, with deliveries to be made in August and September (Gibson TR. 548). Ostwald, as the figures given for its sales indicate, reached a peak in 1968 of $6,391,000 (Gibson TR. 552, DX–1). This, defendant suggests in its trial memorandum, came as a result of efforts by Ostwald's "old" or "selling" management to inflate the 1968 sales figures and thus the acquisition price to be paid by CCM.[3] The results were unrealistic delivery commitments, the effects of which were felt in subsequent seasons. As the 1970 delivery season arrived, Ostwald found production lagging behind obligations by an increment of 5000 units each month (Gibson TR. 550).

To avoid future problems of this nature, CCM–Ostwald decided on a bonus plan giving customers an incentive for early ordering, which in turn would allow pre-peak season production (Gibson TR. 551, GX–84). The incentive itself, as set out in Ostwald's brochure (GX–84), consisted of free Conn instruments, the number dependent on the size of the order.

The result of the plan was the receipt of 52 early orders, 33 of which came from old customers, all together amounting to $315,086 in sales. The instruments cost Ostwald $13,433, and were paid for at dealers' prices (Gibson TR. 555–56).

The offer was not continued past the 1970 season, due to its lack of substantial success and the extremely adverse reactions of instrument retailers, upon whom Conn depended to market its products (Coyle TR. 635, Echols TR. 819–20, Hale TR. 926).

*5. Manufacture*

Band uniforms are almost never sold "off the rack", but, as described above,

3. This conclusion in part is supported by the decline in Ostwald's sales revenues to $5,533,000 in 1969, $5,381,000 in 1970 and $5,388,000 in 1971. Profits reflected the decline, as Ostwald's 1968 net gains of $564,000 became losses of $182,000 in 1969, $244,000 in 1970 and $25,000 in 1971 (DX–A, para. 19; DX–N).

are made to order based on the final sketches and samples approved by band directors and school purchasing authorities (GX 23–53, 58–63, Heldman TR. 70, 124, DeMoulin TR. 133, Revelli TR. 226–7, Downing TR. 292). Order sizes generally stay under 250 uniforms, and, due to size variations, cutting of the patterns is done a few at a time (DeMoulin TR. 136–37, Portner TR. 743).

The basic jacket and trouser are assembled and sewn as is civilian wear, and, as with the ordinary sports coat, the band jacket is made to retain its shape by installing canvas between the lining and outer cloth, or "fusing" (Portner TR. 707, 709). Unadorned, the finished product resembles a highly styled suit, and differs little in appearance from police garb (Compare DX–X with DX–AL).

Traditional military-type band uniforms have a good deal of braid and trim, which is purchased ready made and merely attached to the garment (Mathews TR. 493, Heldman TR. 121).[4] This is done with a "Cornelli machine", a sewing machine operated from under the table with a handle designed to allow the operator to follow the turns and loops in the braid itself (Reinhart TR. 520). It is also used for manufacture of capes and boleros, and to sew on sequins (*Id.*). Cornellis are not available new, but can be purchased used for around $600. Regular sewing machines can be converted to less efficient versions of the Cornelli (Reinhart TR. 531). Sol Frank, Inc., the 4th ranked manufacturer of traditional band uniforms, with 9.5% of the market in 1968, does not use Cornellis, but has chosen to improvise (Frank TR. 200).

The braid and trim alone, however, do not set apart the band uniform from bellhop or theatre usher outfits. The latter, in fact, can be regarded as more ornate than band uniforms (See DX–AI). What is different about the band uniform is its overlay.

An overlay is like an overvest, sleeveless and generally waist length, and is worn on top of the jacket (Mathews TR. 494–95). It is made of stakleen, a naugahyde plastic material, readily purchased, and in common use for seat coverings and auto upholstery (Mathews TR. 493, Reinhart TR. 526, 536). Braid and trim are applied to stakleen with the Cornelli, and, after cutting, seaming is done with regular sewing machines (Reinhart TR. 528).

Aside from the Cornelli, the only specialized apparatus used in band uniform manufacture is the multiple head embroidery machine, which is also used in making sheets, pillowcases and handkerchiefs (Reinhart TR. 525–26, DK–V). Other machinery, such as single and double needle sewing machines, stitch and filling machines, serging, merrow, button and bar tack, Bonez, Reese pocket, basting, and buttonhole machines are in common use in general garment making (Mathews TR. 488–90, Reinhart TR. 520–23).

Capable production personnel are, for the most part, available to a manufacturer on request to the appropriate union. Markers, cutters, lining men and sewers, for example, are obtained by Ostwald from the Amalgamated Clothing Workers of America (Karmajin TR. 508–12). Braid and trim sewers, if lacking experience in Cornelli or multineedle operation, require some training (Karmajin TR. 514, Frank TR. 179, Heldman TR. 74).

## B. C. E. WARD CO.

Through 1969 the C. E. Ward Company manufactured band uniforms. Sales for 1968 amounted to $99,000, giving Ward 0.6% of the general market and 0.7% of the traditional.

Ward was acquired by CCM in June, 1968, several months prior to the Ostwald acquisition. Subsequently, in its "1970 Financial Plan" (GX–117), Ward announced that it would discontinue band uniform production.

---

4. Ostwald also purchases the emblems, cords and belts for its uniforms. Mathews TR. 493.

Ward is primarily a manufacturer of choir robes and lodge regalia, being number one in the latter market and the third ranked company in the former (GX 117, 22). A break-down of its sales revenues, product by product, for 1967 reveals that band uniforms generating $80,554.50, was but a minor facet of its business, as lodge regalia produced $1,105,673.79, church vestments $687,-594.87 and caps and gowns $312,931.71 (GX–22, a financial report of the C. E. Ward Co. for 1967).

Mark-up on these uniforms was 60%, lower than on any other of its lines, (GX–22), and, as of 1967, it was the only product to fail to better 1964 sales performance (GX–22, Statement I). Band uniforms, however, did serve to fill a seasonal gap for Ward. Looking to month to month delivery figures, orders for church vestments were filled primarily between November and March, caps and gowns in April and May, with lodge regalia being delivered on a constant monthly basis. Band uniforms were delivered by Ward primarily in August, September and October, which brought these months into line in terms of percentage of total unit shipments with the rest of the year (GX–22).

The express object of this shift out of band uniforms was to allow greater concentration of company resources in its more profitable lodge regalia line (100% mark-up, GX–22 at p. 5) and to begin production of blazers, projected by Ward to be a dollar for dollar substitute for mand uniforms (GX–117 at p. 3).

### C. LINE OF COMMERCE OR PRODUCTS

Section 7 of the Clayton Act proscribes mergers and acquisitions that may substantially lessen competition " . . . in any line of commerce in any section of the country. . . ."[5] This invites—indeed, directs—a court, when presented with a challenge under this provision, to determine at the outset just what subdivision of the economy constitutes a meaningful frame of reference for analysis.

The parties have agreed that the continental United States constitute the "geographical market". They are in dispute over delineation of the relevant product market.

The government took the position in its complaint that CCM's acquisition of Ostwald threatened anti-competitive repercussions in the band uniform trade generally.[6] Subsequently, in its trial memorandum, government counsel attempted to differentiate between the traditional military type uniforms and the plainer blazers that are occasionally worn by bands—and to carve out a submarket comprised of only the former.

Defendant opposes the finding of such a submarket and would expand the line of commerce beyond even that of the general band uniform trade. It contends that the acquisition should be assessed in terms of its effects on the entire made-to-measure uniform industry, encompassing police uniforms, theatre usher garb and the like.

■ Analysis here should be confined to the effects of the acquisition on the band uniform trade generally. The essence of § 7 is competition, and only those products that actually compete for sales should be grouped and analyzed within the same commercial or product line. Defendant's argument for defining the product market as made-to-measure uniforms ignores this point. As discussed heretofore, there is a good deal of similarity in appearance and manufacture between various types of uniforms, and, as defendant asserts, it would be relatively easy for a maker of one variety to expand his line to others. But, to put the matter somewhat simplistically, there is no competition between usher and firefighter uniforms; policemen do not consider band garb an alternative to their traditional blues.

The Supreme Court has spoken on this precise point in Brown Shoe Co., Inc. v.

5. 15 U.S.C. § 18 (1973).

6. Complaint, para. 14.

United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), wherein a merger of two concerns, each a maker and retailer of shoes, was challenged under the Clayton Act. The government asked that the product market be defined as footwear generally, pointing out similarities in appearance, price, manufacture and manner of retailing, but the Court declined to do so. It noted that within this broad category were three distinct segments that in no way competed with each other, men's, women's, and children's shoes, and held that each of these constituted a separate product market for § 7 purposes.

This principle works in the converse as well. The government here would eliminate from consideration blazers sold and used for band uniforms. It argues that in both appearance and price, band blazers differ extensively from traditional military type band garb. This, however, does not negate the fact that blazers are a viable alternative to the more common uniform replete with shako and overlay, and are preferred by a good number of bands in the northeast. United States v. Continental Can Co., 378 U.S. 441, 452–457, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964).

## D. THE MERITS

■ With the market defined, the anti-competitive effects, potential or actual, of CCM's acquisition of Ostwald can be discussed. Based on the following analysis, I find that these effects are at best *de minimis*, and that the government has failed to meet its burden of proof.

The government has put forward a far-reaching case, based as it is on almost every conceivable theory recognized under § 7. Specifically, the acquisition is challenged as: (1) entrenching Ostwald in its dominant position in the industry; (2) raising barriers to new entry; (3) threatening to trigger further mergers in the trade as lesser firms seek large allies in order to keep up; (4) a horizontal merger; and (5) removing CCM as a potential and actual competitor in band uniforms.

### 1. Entrenchment, Entry Barriers and "Triggering"

There is the assumption that a concern, once made a part of a conglomerate, finds itself a mere powerful factor in its market. And, the rubric goes, if the concern was the industry leader, it becomes further entrenched. Barriers to new entries are raised as the power to reckon with is itself more powerful, and existing competition, to keep pace, must seek powerful allies.

■ The drastic remedy of divestiture, however, cannot be had on assumptions. There must be factual bases and economic theory as applied to such facts indicating synergy to be in the offing.

The anti-competitive chain reaction in this case, it is contended, gets its impetus from two specific benefits Ostwald has received or will receive from becoming a member of the CCM family; (a) access to CCM's advertising potential and media discounts and (b) access to CCM's large sales force and the resultant potential to join with CCM in offering "one-stop-shopping" to educational institutions for all their needs, particularly in relation to music education but also in respect to other disciplines.

### (a)

There is little doubt that CCM does a great deal of advertising, and, as a result, is accorded preferential treatment by the media. And, in spite of the lack of particularized proof as to what media CCM uses, its ownership of the G. Schirmer Company, the Slingerland Drum Company, the U. S. School of Music and C. G. Conn Ltd. allows the inference that it utilizes or will utilize the same promotional vehicles that Ostwald has. Ostwald, then, will have access to whatever discounts CCM enjoys in this regard and will thereby be "advantaged".

■ Advantage for § 7 purposes, however, means substantial competitive advantage. The ability of the smaller

acquired firm to advertise at the rates enjoyed by its purchaser has been found injurious to competition only where advertising is itself a significant factor in the smaller firm's market. Federal Trade Commission v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L. Ed.2d 303 (1967); General Foods Corp. v. Federal Trade Commission, 386 F.2d 936 (3d Cir. 1967).

■ Advertising, as set out above,[7] is a minor factor in the band uniform industry. For schools, which comprise 95% of all end users, uniforms are major purchases, not made on the basis of television or newspaper spots, but rather as a result of an involved process of personal salesmanship and competitive bidding.[8]

Ostwald has never expended more than $67,421 in any one year for advertising, corresponding to a little over 1% of gross sales revenues, with expenditures more normally maintained in the much lower $30,000 to $36,000 range. (*Supra* at p. 988 see also DX–N).

(b)

■ The government warns that Ostwald will become unassailably entrenched in the band uniform field by adding its uniforms to the list of products marketed by the 375 sales representatives of CCM that deal with educational institutions. Utilizing, as well, CCM's regional curriculum centers, CCM-Ostwald, continues the argument, will be able to offer convenient one-stop-shopping to schools for all their needs.

Based on the hard evidence, this argument is unpersuasive. Band uniforms are major acquisitions for schools, which acquire them upon weightier considerations than superficial convenience.[9] This is clear from the elaborate sales effort culminating in competitive bidding demanded by a school before it will award a uniform order to a given company.

Uniforms are made to individual measure and design, making production in advance of orders impossible. Orders, however, come in seasonal waves, and do not precede customer delivery requirements by a good deal of time, thereby periodically taxing an inherently slow production process marked by small-lot cutting and myriad technical operations on small but complex machines incapable of mass production within a relatively short period of time.

An increase in the sales force, therefore, should it increase business, would require far greater investment in production facilities to expand the entire operation. Note, in this regard, the difficulty encountered by Ostwald in meeting increased delivery commitments made in 1968.

The market itself would not justify expansion on this scale. Profit margins are low in this industry,[10] and Ostwald's sales and profits have shown steady declines.[11] Long range prospects are not good either; schools, the principal consumers of band uniforms, face a decline in student population in the immediate future.[12]

---

7. *Supra*, at 988.

8. In United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D.Ill.E.D. 1968), the court was presented with a challenge to the acquisition of the Nissen Corporation, a manufacturer of gymnastic apparatus, by Wilson Sporting Goods Co., a maker of sporting paraphernalia of all types. The claim that Nissen would benefit from Wilson's advertising discounts was answered by the realistic finding that the purchasers of gymnastic apparatus, given the cost and nature of the goods, would not respond to promotion, but would make rational, well considered decisions based on their needs and the suitability of a given product. (at 552). See also Butler Aviation Co. v. Civil Aeronautics Board, 389 F.2d 517 (2d Cir. 1968).

9. See fn. 7, *supra*, at 992.

10. DX–BG, Plaintiff's Answers to Interrogatories 6(p) and 45, GX–22.

11. See fn. 3, *supra*, at 988.

12. This was the finding of the Cresap Report at Chapter VI, p. 3.

Of paramount importance, the government's argument is commercially untenable. Most band uniform makers market their wares through independent representatives who offer other products as well, but, as extensive testimony at trial made clear, this is not an efficient method of distribution. It is done simply because most firms do not generate enough sales in a given territory to allow a salesman to deal only in band uniforms.

Some significant expertise of salesmen is required by manufacturers, as Ostwald's training process indicates, but more importantly by school band directors, who look for assistance in design, pricing and fitting of the uniforms. The salesman must also act as an intermediary between his company and the director to insure a conforming product, and to facilitate alterations that inevitably become necessary.

This process is a full time effort, making it almost impossible for the salesman, even with the necessary diverse training, to attempt to effectively sell other wares in a single visit to the client school. Separate visits, therefore, are required—visits which are incapable of convenient coordination. Uniform sales are made on 3, 5 or even 10 year cycles, not yearly as with texts or diplomas, nor periodically as with paper goods, nor as needed in the case of audio visual equipment.

Ostwald is one of the few band uniform manufacturers which has consistently generated enough business to keep full-time representatives in the field. Prior to the acquisition by CCM, however, its marketing force consisted of 24 independent agents, as well as representation in the southwest by a varying number of employees of the Star Engraving Co. The only change in this has been in the opposite direction than that predicted by the government. The 24 agents were converted to full-time salesmen, and given a draw against commission, an overdue policy decision in no way prompted or facilitated by the merger as such.[13]

## 2. Horizontal Aspects

At first blush, CCM's ownership of the C. E. Ward Company at the time of the Ostwald acquisition would appear to create problems. In 1968, Ward was responsible for .6% of the band uniform market, with sales revenues of $99,000. Ostwald then controlled 41.9% of the same market. All the earmarks of concentration are present as only eleven firms had a 1% or greater share and the top four accounted for 69.6%. Moreover, since the industry leaders have maintained the market shares and positions relative to each other for a goodly period of time, it is easy to perceive the specter of an oligopoly in this industry.

In what appears to have been a statistically similar situation, possibly even less compelling in its percentiles, a divestiture order of the Federal Trade Commission was upheld by the Court of Appeals for the Second Circuit. In that case, The Stanley Works v. Federal Trade Commission, 469 F.2d 498 (2d Cir. 1972), the product involved was cabinet hardware. The Stanley Works ("Stanley") was a powerful factor in the hardware and power tool industry with sales revenues in 1965 of $123,000,000. It was a growing company with net earnings up 57% in the 1963–65 period alone. Its 1965 sales in the market under scrutiny were $814,000, ranking it 10th with approximately a 1% share, in an $80,000,-000 industry.

In 1966, Stanley acquired the Amerock Corporation ("Amerock"). Amerock made household hardware of all types, with overall sales of $29,400,000 in 1965, an increase of 23% over its 1963 revenues. It led the cabinet hardware in-

---

13. Policy changes that coincide with a merger, but are not in any way facilitated by it or attributable to it, are not to be considered in passing on a challenge under § 7 to the merger. Sterling Drug Inc., 3 CCH Trade Reg.Rep. ¶ 19,961 at 21, 982–21, 983.

dustry with sales of $18,000,000 in 1965, and a market share of between 22% and 24%.

The court found the market concentrated, as the top four firms accounted for 49–51%, and concluded that a merger of concerns holding 22% and 1% in fact threatened competition.

Judge Mansfield, in a forceful dissent, charged the majority with having made a simplistic *per se* determination. He calculated actual competitive overlap to be no more than .5% and found "a complete absence of indicia indicating a possible anti-competitive impact." (No. 71–1742 at 98).

The majority's rejoinder was an express disavowal of a *per se* finding.[14] Stanley, it asserted, had been determined to be a price leader in the general hardware trade, a position, according to internal memoranda unearthed by the Federal Trade Commission, that was being used to help keep prices high.[15]

The Federal Trade Commission had found that the market was rigid and lifeless, notwithstanding the great recent growth of Stanley and Amerock. Such rigidity, it was determined, rendered the industry susceptible to a possible "tipping effect" should its delicate balance be upset by mergers of this sort.[16]

Perhaps more significant was the obvious fact that the cabinet hardware industry was not realistically independent of the hardware trade generally. The narrow market in *Stanley* was accepted by the court as its focus on the strength of a stipulation by the parties themselves.[17] Stanley's 1%, when viewed in light of its position as the dominant factor and price leader in hardware, takes on greater importance.[18]

Taking the *Stanley* majority at its word, this court will eschew the *per se* approach here; the focus will be on what detriment to competition, actual or potential, is threatened by the Ostwald acquisition.

Ward's share of the general band uniform market was .6%, substantially less than *Stanley's* 1%, approximating instead the .5% competitive overlap— which Judge Mansfield in his dissent saw as *de minimis*.

What is *de minimis* in a given case, however, is not a simple question. The Court of Appeals found against Stanley in this regard on the strength of United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964) ("Alcoa"). There, the 1.3% share of the aluminum conductor market commanded by the Rome Cable Corporation was held significant when merged with Alcoa's 27.8%, given that the market was highly concentrated, the top four firms controlling over 76%. Significant, however, was the Court's finding that a severe trend toward concentration characterized the industry. The past six years had seen four other acquisitions of smaller aluminum conductor producers, and it was ascertained that the *Alcoa* merger was in part a response.[19] More compelling, the purchaser in each of the prior acquisitions was an integrated concern, combining the production of raw aluminum with conductor manufacture.[20]

Turning, then, to the issue at hand, Ward accounted for only .6% of the market, not 1.3%. No prior mergers in the band uniform trade have been brought to this court's attention, no indication of a trend toward concentration has been shown and no testimony was offered suggesting that competing uniform makers would seek powerful allies through later mergers—even though representatives of Ostwald's competitors were witnesses at the trial.[21] No inte-

---

14. 469 F.2d at 508.

15. *Id.*, at 505.

16. *Id.*

17. *Id.*, at 500.

18. " . . . a firm like Stanley . . . " 469 F.2d at 508. *See also*, 499–501, 505.

19. 377 U.S. at 279, fn. 6, 84 S.Ct. 1283.

20. *Id.*, at 279, 84 S.Ct. 1283.

21. Note in this regard United States v. Wilson Sporting Goods, 288 F.Supp. 543, 556–558 (N.D.Ill.E.D.1968).

gration is present here. Prior to its withdrawal from the band uniform business, Ward and Ostwald operated on the same level as manufacturers and distributors of their product, neither making the cloth and stakleen they used, and both purchasing shakos and other accessories from other firms.

All that in fact can be said of CCM's acquisition of Ostwald at a time when it owned Ward is that competition might have been lessened to that minimal degree of actual competitive overlap then existing between CCM and Ostwald—i. e. the .6% share of the band uniform market controlled by Ward. In sum, despite superficial statistical appeal, the Ward overlap issue has little substance in fact.

The reason for this conclusion lies in the market itself. Unlike the companies that resulted from the mergers in *Alcoa* and *Stanley*, CCM, Ostwald and Ward have little ability, if any, to affect competition in their market. Prices are not left to a price leader, nor determined by tacit maintenance of the status quo by oligopolists. Sales are affected only after competitive bidding, itself preceded by efforts to satisfy a band director as to a host of factors, including design. Salesmen operate on commission, not straight salary, and vie vigorously with representatives of other concerns for contracts. As a result, profit margins are lower than in the garment trade generally. The consumer is clearly king in this market.

The Ostwald acquisition does not, in this regard, rise to a violation of § 7 of the Clayton Act.

### 3. The Potential Entrant Issue

█ Rather than buy Ostwald, it is contended, CCM should have built up the band uniform trade of Ward, thereby adding to competition, not detracting from it.[22] Simple in its logical appeal and stoutly supported by ample precedents, this argument, in the view of the writer, nevertheless has little support from the proofs in this case.

It has already been determined that in spite of the percentages involved, direct detriment to competition threatened by the Ostwald acquisition is *de minimis*. In large measure, this is because market practices—and the market—favor the consumer. Profit margins are low, in part due to this consumer bias, in part due to high costs of producing a made-to-design and measure product in seasonal waves, the slowness of the production process itself and the extensive efforts sales require. Add to this the projection of a declining school population importing a decline in consumers, and a peculiar situation is made out. Competition is in fact strong in the band uniform trade, yet the prospects for the "trade" or industry itself are not great.

In its extensive analysis of the legislative intent underlying § 7 in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court arrived at the realistic proposition that the provision was designed to protect competition, not competitors (at 320, 82 S.Ct. 1502). See, also, United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D.Ill.E. D.1968). The government, however, is asking the opposite in that it has offered no evidence implying, let alone proving, that an increase in the number of competitors would enhance competition. And, on the record before me, there is serious doubt that it would. True, no actual finding that supply is at

22. The government does not press the additional argument that CCM, ignoring for the moment its ownership of Ward, was a likely or at least potential entrant *de novo* into the band uniform trade. CCM is not otherwise involved in garment manufacture or distribution, thereby lacking the plant, personnel and expertise found relevant in Federal Trade Commission v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), nor, as discussed, *supra*, at 987–988, 992–993, would its marketing organization be easily adaptable to *de novo* entrance.

its optimal point, or that saturation would result from the introduction of new concerns, can be made, but neither can the contrary be found. The government's burden has not been met.

The probabilities are that CCM would not have chosen to allocate the resources and take the risks of building up Ward's band uniform business, barring, of course, major changes in the market. Ward's profit margin on band uniforms is lower than on any other of its lines. Sales generated only $99,000 in 1968, representing well under 5% of overall revenues, making band uniforms Ward's only product to have failed to surpass sales of five years before.[23]

In fairness to the government, it must be recognized that such changes in the market alluded to above could occur, for example, in the form of oligopolistic practices by the major manufacturers, resulting, *inter alia*, in artificially inflated profits. Thus, in accordance with traditional theory, the very potential of Ward, backed by CCM, to move in and undercut would act to dampen any such contemplated action.

The difficulty with the theory involving CCM is that every major garment manufacturer in the nation could as easily be a new entrant into the market. As heretofore found, the additional machinery needed to adapt a ready made civilian clothing operation is minimal; existing apparatus can be utilized; labor comes from union halls, for an expanding competitor as well as a new entrant; materials and accessories can be purchased from available sources; and, assuming that the investment is justified by market conditions, sales personnel can be trained in much the same way the expander would find necessary to do.[24]

Not surprisingly, then, the authorities set forth by plaintiff, by their very facts, indicate that what is before this court is not at all the threat to competition in violation of § 7. In United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) divestiture was ordered where the sole out-of-state supplier of natural gas to California merged with the only other important supplier west of the Rocky Mountains, its only potential competitor. Entry barriers were high, given the huge investment required to construct a pipeline, and no conditions existed in check of the potential monopoly power of the combination (at 659–662, 84 S. Ct. 1044).

In United States v. Penn-Olin, 378 U. S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), a joint venture to manufacture and sell sodium chlorate in the Southeast was formed by two leaders in the chemical industry. Because the issue was complicated by patents held by one of the parties, the absence of possible competitors, and indications on the record that entry by one or both of the joint venturers independently was likely (at 175, 84 S.Ct. 1710), the case was remanded for further findings.

These cases have little or no application to the band uniform market, which appears to have built-in defenses to oligopoly, buyers' market that it is, and is "guarded" by the existence on its fringes of a mammoth industry clearly capable of entry in the unlikely event conditions change. Divestiture on this basis, therefore, cannot be justified.

*4. Conclusion*

For the reasons discussed, it is held that plaintiff has failed to meet its burden of proof in support of its claim to divest Ostwald from CCM.

## II

### ACQUISITION OF C. G. CONN LTD.

C. G. Conn Ltd. ("Conn") was acquired by CCM in May, 1969. It was then a manufacturer of musical instruments, a prominent name in wind instruments and the leader in brasswinds.

In 1969, Conn accounted for 112,697 of the 2,584,033 instruments of all types sold domestically, 88,615 of the 547,000

---

23. *Supra*, at 989–990, GX–22.

24. *Supra*, at 987–989.

wind instruments so marketed and 54,164 of the 186,055 brasswinds.[25] Translated into market shares, Conn was a substantial factor, with 4.3% of the general instrument trade, 16.2% of the wind instrument trade and 22.4% of the brasswind market.

Conn, nonetheless, was faring poorly. Overall profits had gone from $1,115,313 in 1967 to $42,838 in 1968, with actual losses of $17,882 being shown by April, 1969, while losses on its wind instrument line had been consistent, $300,000 and $400,000 in 1967 and 1968 respectively, and $1,200,000 in 1969.[26]

At the request of CCM, the firm of Cresap, McCormick and Paget, Inc. undertook an in-depth study of Conn. The report, entitled "C. G. Conn Ltd. A Management Audit," was completed in September, 1969 and brought to the attention of the court by the government.[27] The Cresap findings showed Conn to be alone in its troubles amidst healthy competitors. It was the only major instrument producer with no sales growth,[28] the only such company to show a decline in profits [29] and the only one suffering a negative return on investment.[30]

Conn, the report continued, suffered from outmoded processes and facilities, inefficient management, lack of positive objectives, poor sales practices and dismal labor relations. The situation had reached the point, for example, where Conn operated with an agreement between its employees and their union whereby workers who earned incentive wages for productivity had to pay those wages into the union once they exceeded a set percentage of the base rate.[31]

CCM, on taking over Conn, found the company with debts it could not meet,[32] and a piano division in serious straits. Also, due to the inefficiency of its manufacturing facility at Elkhart, Indiana, Conn had resorted to reselling instruments purchased from competitors in order to continue a product under the Conn name.[33]

Clearly, as succinctly stated by government witness John Latter, executive vice president of G. Leblanc Corp. and past president of Conn, "someone had to come in and save the company." [34]

The Cresap report, as testified to by Malcolm W. West, a vice president of Cresap, McCormick and Paget, Inc. at the time of the study, and in charge of the project, implied that certain changes in Conn were necessary to its survival.[35] CCM followed these suggestions: the piano operations were closed; manufacturing at Elkhart was curtailed; the possibility of relocation in Abilene, Texas was investigated; and purchases of instruments from foreign manufacturers, mostly Japanese, were increased.[36]

The result was an increase in Conn's losses on wind instruments, from $1,200,000 in 1969 to $1,800,000 in 1971 [37] while overall company profits rose. The $17,000 loss of the first four months of 1969 was recouped, and, due mostly to the discontinuing of the piano division, a profit of $831,000 was regis-

25. DX–A, Stipulation of Facts, pp. 8, 11.

26. DX H through M.

27. GX–118, hereinafter the "Cresap Report."

28. Ex. II–1, Cresap Report, Chptr. II, Ex. 1.

29. Ex. II–3, Cresap Report, Chptr. II, Ex. 3.

30. Ex. II–4, Cresap Report, Chptr. II, Ex. 4.

31. Cresap Report, App. E, p. 10, McIlhenny TR. 447.

32. Latter TR. 404, 421–422.

33. DX–A p. 11, 15, Latter TR. 413–414, 417.

34. Latter TR. 409.

35. West TR. 259.

36. McIlhenny TR. 449, DX–A, p. 15. As of 1971, Conn no longer manufactured but purchased for resale student trumpets, coronets, trombones and some saxophone lines, flugelhorns, oboes, English horns, bassoons, string instruments and related accessories. McIlhenny TR. 454–6, 471, Echols TR. 786.

37. DX H through M.

tered by the end of the year. Pluses were recorded in 1970 and 1971, but these fell short of the 1969 achievement, amounting, respectively, to $504,000 and $239,000.

Instrument sales by units, after a decline in 1969 from 2,672,718 to 2,584,033, rose in 1971 to 3,182,500.[38] Market shares, however, as can be inferred from Conn's decline in wind instruments from 16.2% in 1969 to 12.7% in 1970, fell.[39]

## A. THE BRASSWIND AND WIND INSTRUMENT MARKETS

### 1. Market Structure

Conn's 1969 market share of 16.2% and sales of 88,615 units ranked it second in the wind instrument industry. Selmer, with unit sales that year of 132,585 and a 24.2% market share was the established leader, with the G. Leblanc Corp., 55,589 units sold and a 10.2% market share, and the Chicago Musical Instrument Company, 55,217 units sold and a 10.1% market share, vying closely for third and fourth place. Together, these four controlled 60.8% of the market.[40]

Four other manufacturers, collectively accounting for 17.9% of the market, could claim a 3% or greater share, leaving a remainder of 21.3% of the market to an unspecified number of smaller concerns.[41]

Narrowing the focus to brasswinds, Conn in 1969 was the industry leader, with a market share, based on its sales

of 54,164 units, of 22.4%. The Chicago Musical Instrument Company was the second ranked concern, 43,852 units sold and an 18.1% market share, followed by Selmer, 32,893 units sold and 13.6% of the market, and King, 26,023 units marketed and a 10.8% market share.

Brasswind concentration exceeds that in the general wind instrument market, as the four leaders that year commanded 64.8%. Adding in the 3 other concerns that could boast a 2.7% share or better, 76.9% of the market can be accounted for, leaving 23.1% to an again unspecified number of lesser manufacturers.[42]

### 2. Market Performance

Economic health in the brasswind and general wind instrument industries appeared to exist at the time of the acquisition, as the vital signs of growth, profits and return on investment were positive for all but Conn.[43] But, according to plaintiff's witnesses, both profits and investment returns were low, and prospects for future growth were not good.[44]

The Cresap Report noted that after 1966 sales volume had begun to level off for brass and woodwinds.[45] By 1971 brasswind sales had fallen 11%.[46] This, in part, may have been due to a 50% rise in sales of string and fretted instruments, notably guitars, during the same four years, but is more probably attributable to the start of a projected prolonged slowdown in school enrollment increases and a general tightening of school budgets.[47] Ninety percent of all brass and woodwinds produced for do-

---

38. DX H through M, A, p. 8.

39. DX–A, 9, 19, 30.

40. GX–1, pp. 7, 10, 11, GX–132 and 133.

41. GX–1, 132, 133.

42. GX 134, 135.
 "Remainder" shares in both the brasswind and wind instrument categories can in part be ascribed to imports. According to the Cresap Report, foreign made instruments were making increasing inroads in domestic markets, amounting in 1968, to 31,619 units of brasswinds, 16,-380 saxophones and 44,423 clarinets. Ex.

VI–6, 7, 8. But, these figures overstate the situation, for, as noted above, at 34, many of these instruments were purchased by Conn for resale under its own name.

43. Supra, at 997.

44. Propp TR. 279, Pascucci TR. 344.

45. Chptr. VI, p. 2.

46. DX–BE, Tariff Commission Report to the President on Petition of Workers Producing Brass and Wind Musical Instruments, April 28, 1972.

47. Cresap Report, Chptr. VI, p. 3.

mestic use are purchased by educational institutions and students.[48]

Mergers and acquisitions have been common in these industries. Selmer acquired, *inter alia*, the Vincent Bach Corporation in 1961 and the distribution rights to the Boosey and Hawk Company's "Bessen" line at a date not shown by the evidence; Selmer itself was acquired by the Magnavox Company in 1969. The Chicago Musical Instrument Company, a subsidiary of the Norlin Corporation as of 1969, purchased the distribution rights to the "Buffet" and "Schreiber" lines in 1971 and the "Armstrong" line in 1972. G. Leblanc acquired Holton, and bought from the Wurlitzer Company in 1970 its "Martin" line. The Getzen Company, Inc. bought E. L. Delford of Elkhart, Indiana and was itself acquired by D. H. Baldwin Co. in 1967.[49]

But, in spite of this activity, the roster of competitors set out above [50] and their relative market positions has gone essentially unchanged for some time.[51] While ownership changes, brand names tend to be maintained, and the acquired companies retain their identities as divisions of the parent.

Trade name and reputation for quality are the most important competitive assets to an instrument maker.[52] The consuming public, almost entirely made up of professional musicians, band leaders and students who seek the counsel of music educators,[53] is impressed with little else.[54] This reputation cannot be borrowed from a successful product not connected with music, nor can an estab-

lished name for one instrument line be traded upon in marketing another.

Such was the unfortunate lesson learned by Baldwin and Wurlitzer, both known for their pianos when they tried unsuccessfully to market wind instruments,[55] and the experience of the Vox Company, reputed for its guitars, when it attempted to sell band instruments under the Vox name.[56]

### 3. Sales and Promotion

Wind instruments are marketed through independent retailers. Schools and students, comprising at least 90% of all end users, demand the constant and ready availability of repair facilities, accessories, counseling on instrument selection, demonstrations and services only locally based dealers can provide.[57] College trained salesmen, some with professional and teaching backgrounds, are employed by these dealers,[58] instruments are warranted by them,[59] and rental-purchase arrangements, whereby the student initially leases his instrument, then, if he chooses, applies the accrued rentals toward its purchase, are handled by them.[60]

Instruments are sold to dealers by a process called "dating". Rather than require immediate remittances, manufacturers allow the dealer to assume the purchase price to be owing as of a future date, giving them, in effect, an interest free grace period.[61] At the time of CCM's acquisition of Conn, 30 day to 6 month dating was the norm, and a trend to more extended periods could be

---

48. Propp TR. 284–85, 289, Pascucci TR. 329. The Cresap Report estimates this to be 95%.

49. GX–1, para. 39.

50. *Supra*, at 998.

51. Pascucci TR. 334, Getzen TR. 382.

52. Latter TR. 422–23, Ash TR. 679, Ohanian TR. 894.

53. *Infra*, at 1000.

54. *Infra*, at 1000.

55. Pascucci TR. 347, Ash TR. 679.

56. Ash TR. 679.

57. Echols TR. 848–49, Ash TR. 672–73.

58. Getzen TR. 392–93, McCloskey TR. 616–17, 623, Downing TR. 303.

59. Pascucci TR. 357–58, Conklin TR. 901.

60. Coyle TR. 629, McGregor TR. 637–8, Kleeman TR. 644, 46, 48, Hale TR. 926.

61. McCloskey TR. 621–22.

detected.[62] Conn was not the most generous in this regard.[63]

Instrument manufacturers have found it all but impossible to undertake direct customer sales.[64] Conn during the 1930's operated 20 retail stores, but found after World War II that it could not so extend itself. The last was closed in 1955.[65] Instead, Conn today relies on some 4000 retailers to market its products, of which 1200 deal in band instruments.[66] This distribution network was put in jeopardy, however, when CCM attempted to induce early uniform orders for Ostwald by offering free Conn instruments. Dealers, who saw their sales undermined, threatened to discontinue the Conn line, and the give-away program was dropped with alacrity.[67]

The role of the manufacturer in the marketing process is limited to general promotion. Clinicians—independent professional musicians whose job it is to raise the level of interest in music and music programs—individually and upon specific occasions are retained by manufacturers.[68] Clinicians perform at the request and frequently expense of a school.[69] No selling takes place at these "clinics", nor are recommendations of specific brands of instruments made,[70] and clinicians are free to act in that capacity for any instrument maker who requests their services.[71]

Sixty to seventy conventions are attended each year by the major instrument manufacturers which establish booths and displays.[72] Advertisements are placed in music dealer and educator journals. Conn publishes its own trade bulletin, the "Conn Chord." [73]

The typical manufacturer also maintains a small sales force, geared to calling on and supplying the retail dealers, training dealers and accompanying a dealer's representative to a school at the dealer's request. Conn employs for this purpose one regional sales manager, two product sales managers and eighteen district sales managers who function as salesmen in the field.[74]

Promotion, however, is acknowledged to be of little direct value in winning sales. Students seek the counsel of band leaders and music educators who are not impressed by publicity.[75] These professionals base their recommendations on the reputation of a company in a given line, their personal knowledge of an instrument's quality, price considerations and the availability of dealer service facilities.[76] Thus, advertising of the manufacturers is directed at the dealer, to bring to his attention new models or lines.[77]

Conn's expenditures for promotion of all types has never exceeed 5% of the dollar volume of its sales.[78] Media discounts available at this level are minimal.[79]

62. Pascucci TR. 337–38, 356, Propp TR. 278.

63. Ash TR. 674.

64. Propp TR. 272, 274, Latter TR. 398–99, McIlhenny TR. 457, Echols TR. 787, 797–98.

65. DX–A(1), Ash TR. 673, Echols TR. 789–90.

66. Echols TR. 837–38.

67. Coyle TR. 635, Echols TR. 819–20, Hale TR. 926.

68. Revelli TR. 239–40, McIlhenny TR. 464–65.

69. Echols TR. 804–5, Beversdorf TR. 919.

70. Revelli TR. 236–38, 240–41, Beversdorf TR. 919–922.

71. Beversdorf TR. 923–24.

72. Echols TR. 815.

73. Echols TR. 813, 821.

74. Echols TR. 782.

75. Crociati TR. 375, Coyle TR. 631, LaValle TR. 856–57, Schoepper TR. 861, Ohanian TR. 893.

76. Revelli TR. 241–44, Downing TR. 298–99, Crociati TR. 372–73, Ohanian TR. 891, Conklin TR. 897, Phillips TR. 908.

77. Kleeman TR. 647, Revelli TR. 244–45, Conklin TR. 899.

78. DX H through L.

79. Majeski TR. 873–75.

## B. LINE OF COMMERCE

There is no dispute over the geographical confines of the market, the parties having stipulated to the use of the continental United States for this purpose. Definition of the product market, however, is a seriously contested issue.

The government has opted for a narrow definition, asking that the focus be on either wind instruments generally or brasswinds as a distinct submarket. CCM, on the other hand, would expand the market to include all musical instruments.

■ I agree with the government on this point, specifically with its proposal to carve from instruments generally and winds as a class the submarket encompassing only brasswinds. The realities of the trade dictate that analysis, to be meaningful, be so focused.

As CCM contends, there is "competition" between instruments of different types,[80] but no competition of the sort found by the court in United States v. Continental Can Co., 378 U.S. 441, 84 S. Ct. 1738, 12 L.Ed.2d 953 (1964) to mandate a finding of a single product market. There, a merger of a glass container manufacturer and a maker of metal containers was found not to violate § 7 of the Clayton Act by the district judge, based on his determination that the two varieties of containers, differing in price, manufacture and physical characteristics, did not belong to the same product market. The Supreme Court reversed, specifically finding that in spite of these differences there was in fact a vigorous struggle between these two products for sales.[81]

While a rise in sales of string instruments may have an effect on brassfinds, the interplay between them does not occur as a result of calculated promotion. No attempt is made to entice the musical public from clarinets to guitars. Instead, it is a passive process, with manufacturers of particular varieties of instruments expanding and contracting production in response to the vagaries of public taste.

The true competition is waged in the effort to develop a reputation for quality in as many different instrument lines as a given manufacturer chooses to produce, so as to absorb the greatest possible share of the other-directed demand for a particular instrument as exists.

Entry barriers to lateral expansion in fact exist in the general trade, barriers as substantial as confront a would-be entrant *de novo* to instrument manufacture. To a man, the bandleaders and music educators who testified at trial cited reputation for quality, as they knew it, of an instrument as the prime criterion in their purchase decisions and recommendations to students. This reputation, as found out by Vox, Baldwin and Wurlitzer, cannot be transferred from one line of instrument to another, but must be earned, product by product.[82]

Quality requires technical prowess, which, again, must be acquired product by product. Common sense alone dictates that a piano maker contemplating expansion to manufacture of tubas faces the task of mastering a new expertise.

Some grouping of instruments, however, is feasible. Reputation of a given manufacturer can and does extend to a class of instruments,[83] and technology, while never wholly interchangeable, is to a degree standard between related types. But, as the proceeding discussion indicates, any such grouping should be kept as narrow as convenience will allow.

Brasswinds, then, rather than wind instruments generally, consisting of both brass and woodwinds, would be the appropriate focus for analysis here. As a subclass of instruments, it is constricted enough to reflect competition as it in fact exists, yet broad enough to allow

80. *Supra*, at 998.

81. 378 U.S. 441, at 457, 84 S.Ct. 1738, 12 L.Ed.2d 953.

82. *Supra*, at 999.

83. Pascucci TR. 335, Getzen TR. 379, 382, Latter TR. 405–406.

**1002**

for resolution of this § 7 challenge on analysis of but a single market.

Brasswinds, such as the trumpet, coronet, trombone, French horn, sousaphone and mellophone constitute a somewhat cohesive subclass, in that they are related both technologically and in manner of play. Sound is produced by blowing into the mouthpiece, and notes are formed primarily by changes in lip position, or embouchure, assisted by depression of a limited number of keys or movement of a slide.

Woodwinds, on the other hand, produce sound by the vibration of a reed, a thin tapering slice of bamboo, activated by the player forcing his breath to pass over it. Note changes are almost entirely caused by depression of a complex system of keys.

Industry recognition of brasswinds as a separate line is significant.[84] The American Music Conference, in reporting instrument sales, cites brasswinds as a separate category,[85] and the Cresap Report, commissioned by defendant itself, treats brasswinds as distinct from woodwinds.[86] Wind instrument makers see brass as a distinct type,[87] some specialize only in brasswinds,[88] and of those that produce both brass and woodwinds, there are some who market them under separate names.[89]

▇▇▇ More importantly, however, postulating for the moment that winds generally would be an equally viable line of commerce, the choice would be dictated by the fact that it is in the brasswind trade that the anti-competitive effect of this acquisition, if any, will be felt most acutely. As set out above,[90] the brasswind trade is the more concentrated, and Conn is the industry leader, enjoying a greater share of the brasswind market than it does of the wind instru-

ments trade. This court would be remiss in selecting between two otherwise appropriate product markets that one which, on analysis, will not reflect the full brunt of any and all anti-competitive effects of a challenged acquisition.

## C. THE MERITS

### 1. Entrenchment, Entry Barriers and "Triggering"

▇▇▇ What, then, if any, effects on competition in the domestic brasswind instrument market does CCM's acquisition of Conn portend? What, given a declining but still healthy market, a concentrated industry, stable on the surface but in fact riddled by mergers, will result from CCM's purchase and efforts to resuscitate the remnants of Conn, the industry leader?

The government, of course, has taken the position that the consequences will be anti-competitive. Conn, in its view, will be competitively advantaged by its alliance with CCM in three specific ways: (1) bolstered by its access to the large financial resources of its new parent, Conn will be in a position to entice greater efforts by independent retailers on its behalf by offering them more generous financing; (2) it can now join CCM in offering educational institutions and students the convenience of one-stop-shopping for all their needs; and (3) it can enjoy the advertising discounts accorded CCM by the various media.

As a result, continues the argument, Conn will be entrenched as the dominant firm in the trade, and the familiar anti-competitive chain reaction will be set in motion. Entry barriers will rise as the power to reckon with is now more powerful and, for the same reason, existing brasswind makers will be discouraged

---

84. Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed. 2d 510 (1961).

85. GX–68 pp. 6, 8.

86. Chptr. VI, p. 1.

87. Pascucci TR. 335, Getzen TR. 379, DX–AY–12 para. E.

88. Cresap Report, Chptr. VI, Ex. 11, DX–AY 9, 11, 12, 19.

89. Cresap Report, Chptr. VI, p. 32.

90. *Supra*, at 998.

from vigorous competition. This, in turn, will increase the level of concentration in the market, or, at the least, act to maintain the status quo.

Even if Conn were the healthy corporation its market position would lead one to believe, the competitive advantages the government claims it would now enjoy are either insubstantial or improbable. Ninety percent of all brasswinds are bought by band leaders for themselves or their schools, and by students on the recommendations of the bandleader. And, as set out above, band leaders look to reputation for quality and personal experience with a company's product, not salesmanship.[91] The inclination of the dealer, induced by liberal dating, could not have a significant impact.

For the same reason, offering convenient one-stop-shopping would hardly engender a considerable increase in sales. But, more importantly, any effort by Conn to market jointly with CCM, would undermine its present distribution scheme.[92] Retailing is left to independent dealers for good reason. Only locally based outlets staffed with trained personnel can provide the servicing and demonstrations demanded, carry on rental-purchase programs and supply accessories as and when called for.[93]

Finally, while CCM is accorded discounts by the media, and Conn may now have access to them, advertising, as defendant correctly asserts, is a minimal factor in the brasswind trade. It is engaged in by the manufacturer to keep dealers abreast of changes and improvements, not to foster public demand.

Conn spends very little for promotion, a good part of which is non-media costs. And, its media use is in good measure the expense of putting out its own trade journal, "Conn Chord", for which CCM's discounts cannot be applied.

Conn, in any event, has not been in a position to exploit advertising discounts, or enter into revolutionary marketing schemes or extend greater credit, whatever the competitive gain might be. It had all it could do to attend to its own resurrection.

The record is more than clear in this regard, and bears little repetition. Conn was no longer a successful brasswind maker, but had been reduced to a wholesaler, maintaining itself by selling instruments purchased from competitors. Its plant and labor relations were hopeless, and according to the Cresap Report, management policy and objectives were misguided. Substantial losses were shown consistently, and the company could no longer pay its debts.

While § 7 reaches threats to competition in their incipiency, it cannot be called into play to thwart non-existent danger.[94] The competitive enhancement of Conn which the government sets forth as imminent is impossible at present and highly doubtful for the future.

Probabilities, not remote possibilities, come within the purview of the act. The government is crying "wolf", warning of anti-competitive effects, themselves insubstantial, that could only come into play when and if Conn is revitalized.

---

91. *Supra,* at 1000.

92. Note the effect of CCM's give-away of Conn instruments, discussed *supra,* at 999–1000.

93. Pre-acquisition memoranda exchanged between Raymond C. Hagel and Richard T. Ney, CCM executives, indicate that the possibility of direct leasing of instruments to schools was discussed. GX 149, 150. It would indeed be surprising if this and other imaginative concepts were not considered. But, probability for § 7 purposes must ultimately rest on economic realities, not on before-the-fact intra-corporate subjective theorizing. United States v. Falstaff Brewing Corp., 410 U.S. 526 at 533, 93 S.Ct. 1096, 35 L.Ed. 2d 475 (1973). *See also* concurring opinion of Justice Marshall therein at 564–570, 93 S.Ct. at 1096.

94. Brown Shoe Co. v. United States, 370 U.S. 294, at 323, 82 S.Ct. 1502, 8 L.Ed. 2d 510.

## 2. CCM AS A POTENTIAL OR LIKELY ENTRANT DE NOVO, AND PRODUCT EXTENSION

 CCM could not be considered a potential entrant *de novo* to the brasswind trade. There was no advantage peculiar to CCM that rendered it particularly suited for success by internal expansion, nor any inference to be drawn by existing brasswind makers that CCM, in particular, threatened to enter should conditions suddenly justify the investment.[95]

The government points to CCM's ownership of Schirmer, music publishing, the U. S. School of Music, music education, and Ostwald, band uniforms, but these fields are peripheral at best, to instrument manufacture. There is no identity of technology, and no possibility that CCM could employ its reputation in these markets to any advantage at all in brasswind distribution.

Even marketing experience, the thread that runs through the government's challenge to both the Conn and Ostwald acquisitions, is not a facilitating factor. Unlike uniforms, and textbooks, instruments are sold by independent locally based dealers. The manufacturer does not involve himself in the servicing, accessorizing, demonstrating or leasing of instruments, but, for the reasons set out above,[96] leaves all relations with the end user to the retailer.

CCM, as the government stresses, does have sizeable financial resources. Such resources, however, play a surprisingly minimal role in facilitating entry to the brasswind market. Beyond the initial investment in plant and personnel, there is little money can buy, as advertising, product appearance and packaging, the areas where sheer volume expenditures can normally be most helpful, are unavailing. Donald C. Getzen established his successful DEC line of brasswinds ". . . on a shoestring,"[97] while Vox, Baldwin and Wurlitzer failed. If the product put out does not appeal to the sophisticated end user, it will fail.

As CCM does not appear particularly suited to brasswind manufacture and can offer no substantial advantage to Conn that would enhance its position in the brasswind market, the acquisition of Conn is not, as contended by the government, product extension as found by the Court to exist in Federal Trade Commission v. Proctor & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). There Proctor & Gamble, the leader in packaged detergents, and responsible for a full line of soaps and cleansers, acquired Clorox, the dominant manufacturer of liquid bleach. The products involved, unlike brasswinds and band uniforms, were truly similar. Detergents and bleach are both high turnover household care items, easy to manufacture, designed for similar uses, and marketed in the identical fashion. But, more importantly, success in the liquid bleach market depends on volume advertising, as does success in detergents, soaps and cleansers. Proctor & Gamble was particularly capable in this regard, being the nation's largest volume user of the media, and thus the recipient of substantial discounts that it could pass on to Clorox.[98]

Although not a potential entrant *de novo* by objective criteria, the government, by dint of intra-office memoranda unearthed from the files of CCM, claims that the conglomerate was in fact likely to enter by internal expansion. There is a survey of possibilities in the general music field, including potential innovations in education, music publishing for the blind, a survey of trade publications and a list of publically owned companies in the area.[99] One is a list of potential

---

95. Note the criteria set forth in the most recent effort of the Supreme Court in this area, United States v. Falstaff Brewing Corp., *supra*.

96. *Supra*, at 999.

97. Plaintiff's Post-Trial Memorandum at 40.

98. *Id.*, at 573–574, 87 S.Ct. 1224.

99. GX–146.

acquisitions,[100] and another discusses the potential of H. & A. Selmer, now owned by Magnovox.[101] GX–148 is a communique on the importation of Japanese instruments for resale, and GX–149 is an inquiry into the viability of establishing direct-to-the-school rental programs, joined with requests to investigate a number of existing brasswind makers for acquisition.

 Such corporate "think tank" memoranda are far less impressive and persuasive than government counsel appear to believe. Given the imaginations of junior and middle level executives, it is possible to substantiate anything from the filings buried and forgotten in corporate file drawers.[102] Paradoxically, serious attention to and acceptance of these memos would undermine the government's position. Nowhere is there a hint that CCM contemplated initiation of its own production facility. All speak to acquisition save one, which asks the opinion of a colleague as to importation and resale.[103]

In any case, there is a dimension to the potential or likely entrant doctrine that has not been satisfied. United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964) and United States v. Penn-Olin, 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964), discussed above, make clear that the state of the market must be taken into account. In both those decisions, the lack of potential and existing competition was found to be significant, as were the all but insuperable entry barriers in *El Paso* and the patent rights held by one of the joint venturers in *Penn-Olin*.[104]

No such precarious conditions exist in the brasswind market. There are a good number of healthy domestic competitors, and foreign competition is on the rise. And, although entry barriers are present, they can and have recently been surmounted.[105]

### 3. CONCLUSION

It is ruled that the government has failed to prove liability of CCM under § 7 of the Clayton Act for the reasons and upon the findings heretofore stated.

### III

### SUMMARY

The alleged anti-competitive potential of these acquisitions by CCM is not borne out by the record and the realities of the band uniform and brasswind instrument markets. The government has not met its burden of proof of violations of § 7 of the Clayton Act.

The government's prayers for divestiture are thereby denied. It is so ordered that judgment be entered dismissing the complaint in its entirety for failure of proof.

---

100. GX–151.

101. GX–147.

102. United States v. Falstaff Brewing Corp., *supra*, 410 U.S. at 533, 93 S.Ct. 1096. *See also* concurring opinion of Justice Marshall therein, at 564–570, 93 S.Ct. 1096.

103. Purchasers for resale, the government has strenuously argued, could not be included in the same universe as the manufacturer. Defendant's efforts in this regard, particularly as to inclusion of Sears Roebuck and Montgomery Ward, growing factors in instrument distribution, were labeled a "false issue". Plaintiff's Post-Trial Memorandum at 29.

104. *Supra*, at 996.

105. *Supra*, at 1004.